Case number 17-5092. Sharon Lee, Reagan-Diaz, Appellant v. Jeff Sessions, United States Attorney General. Ms. Carlton for the Appellant, Mr. Kolsky for the Appellee. All right, Ms. Carlton. Good morning, Your Honors. Good morning. May it please the Court, my name is Cedar Carlton. I'm here representing Ms. Sharon Lee, Reagan-Diaz. I'd like to reserve three minutes for my rebuttal, if I may. On October 5, 2012, the FBI told Ms. Reagan-Diaz in an email to stay home and keep collecting full-time workers' compensation payments, even though Ms. Reagan-Diaz wanted to start working at that time. And just a few days earlier, the highest level of division management had said in an email that she would be able to help the FBI advance its mission on her requested limited-hour schedule. And on that very day, October 5, 2012, when the FBI told Ms. Reagan-Diaz to keep taking full-time workers' compensation benefits, the supervisors in the Resource Planning Office where Ms. Reagan-Diaz worked had just identified a suitable assignment for Ms. Reagan-Diaz in the Corporate Policy Office, which is another part of the Resource Planning Office. A suitable assignment that a jury could find in which Ms. Reagan-Diaz could perform her essential functions of her job. And in that email, it explicitly said that Ms. Reagan-Diaz would be able to perform that assignment on her requested schedule, which was two hours a day from an office close to home. So your client, at least until I guess May 2013, had never committed to anything more than two hours per day? Ms. Reagan-Diaz had requested to work two hours a day in order to increase her workday. Is there any case that suggests two hours per day is a reasonable accommodation that would enable a previously full-time employee to perform essential functions of a full-time job? Well, the Department of Labor ruled in the Lund case that an employee could come back to work on a two-hour day schedule and increasing their hours from then. But for Rehab Act purposes? For the Rehabilitation Act purposes, I don't know of a case where an employee requested to start two hours a day, but I do know that this Court has repeatedly advised against categorical rules on accommodation requests. Sure, they can't categorically say we will never consider any adjustment of work schedule for any job because we don't feel like it. But I don't know of any case that goes nearly this far to say that an employer has to come down to two hours a day where the employee was working in a job that was full-time and that seemed to put a premium on being at work and going to meetings frequently and the position was a liaison position. What the Supreme Court said in Barnett is that an accommodation needs to be reasonable on its face, which would be defined as something that would be feasible for the employer. And in this case, the division had the highest level of division management. On May 22, in response to an email where Ms. Reagan-Diaz said she was ready to work two hours a day from an office close to home, that division had said that she would be able to do meaningful work on that schedule that she requested. And Barnett specifically defined reasonable on its face as something that's feasible for the employer. And here, a jury could find that the division head knew what was feasible for his department. The district court ignored what the division head testified to in his deposition. The district court had two different grounds for finding that the plaintiff could not fulfill the essential functions. One was that two hours a day wasn't sufficient. And then the second was that that schedule would not enable her to participate in impromptu meetings, especially impromptu meetings that might involve classified information. And I looked at the statement, I guess that's the plague of being a former district court judge. I looked at your statement of disputed facts and the responses thereto. And I never saw any evidence that you disputed that the nature of this work was that there were impromptu meetings. In this opposition to the statement of material facts, in the opposition to summary judgment, we cited to Ms. Reagan-Diaz's affidavit declaration, which said that some of the meetings that she had attended before her injury would have ended. So what was important to note was that – But she never says that – I mean, they asserted as an affirmative fact that there are impromptu meetings. So her saying that the meetings that we used to have, we won't have those meetings anymore, isn't responsive. It doesn't place that fact into dispute. She needs to say that there are no impromptu meetings. They could all be scheduled during my two-hour window. Well, Your Honor, the evidence that there were not impromptu meetings in the relevant time period under MNTER, which would have been at the time that the defendant was denying the accommodations, this is post-injury, after Ms. Reagan-Diaz was coming back to work as a disabled – wanted to come back to work as a disabled employee. In that period, another colleague, a non-disabled colleague, was allowed to work on the very same Sentinel projects one to two hours a day. That did not require more than two hours of availability for the impromptu meetings. So even if there were some impromptu meetings, a non-disabled colleague was able to do Ms. Reagan-Diaz's projects in that two hours, and those were cited in her one-to-two-hour day schedule. But that was an employee that worked full-time but only devoted one to two hours a day to this project. Right. So the District Court – So they are available at any time for a meeting. So any time during their nine-to-five period, they can set aside or take 15 minutes here or 30 minutes there and another hour here to devote one to two hours to it. But what she's asking to do is something materially different from that, which is, I want to work – whatever it is, it will be 10 to 12 this day or two to four the other day, and any meetings that would have to take place that she would participate in would have to be during that window, right? Well, I see what you're saying. The thing is that a supervisor of that non-disabled colleague testified in his deposition on page 400-401 of the record that the one-to-two hours a day was on top of Ms. Stoddard's other duties. So the non-disabled colleague was working full-time and had other duties where she would not have been available for impromptu meetings during the time. That's quite a leap to say she would not have been available for impromptu meetings. Well, I think it's a fact issue that a jury could infer that if this person was awarded for working above and beyond, is what the testimony was, that the one-to-two hours a day was above and beyond, a jury could decide that. You have to infer from something. What is the evidence from which the jury would infer that? Inferring from the fact that the other colleague had other duties, full-time other duties, and the one-to-two hours a day that she was doing, where she was performing Ms. Reagan-Diaz's projects, was on top of her full-time work. So you would say from that, a jury could infer that, therefore, she would not be available for impromptu meetings? That she wouldn't be available during the time that she was in meetings on her other projects and that she was working full-time on other work. Remember, that happens to all employees. You're doing something else sometimes when you're needed for an impromptu meeting. Right. That doesn't require compensation. Well, the other thing is that the FBI on October 5th identified a project, and in this e-mail on 1622-23 of the record, specifically saying that they found other work that Ms. Reagan-Diaz could do that did not require meetings. It says in that e-mail. So under ACCA, the employer has a duty to communicate with the employee about other options if the employer indeed found at the time. Now, there's no evidence in the record that you – and at the end of the analysis, you have to come forward with evidence of discrimination or discriminatory animus. I'm talking about their reassignment. The fact that you have here is that another full-time employee could work in the time for impromptu meetings, but she was two hours. If it's recognized that two hours makes it very difficult, if not impossible, to have the impromptu meetings. Is that your best? This is the failure to accommodate claim. It's not a disparate treatment claim. This is provided as an ACCA. I understand that, but the same analysis would seem applicable, would it not? You have to come forward with some kind of animus that the causative factor contemplated by the statute is in fact the causative factor here. I'm sorry, Your Honor. I did not hear you. I understand that this is a different statute than the one labeled in ACCA. It's not the same fact, rather, as the one labeled in ACCA, but would it not be the same analysis? It's – well, the part of their – there was a disparate treatment part of ACCA, but there was also a failure to reassign section of ACCA, and in that section, that was a failure to reassign in a failure to accommodate claim. And the court specifically said that the employer has a duty to communicate the options to the employee for reassignment if the employer thinks that the employee cannot do the essential functions of the job. I'd like to add that at the time, nobody is here for impromptu meetings. These are reasons that were brought up in litigation. There is also a responsibility for the employer to communicate with the employee if it thinks that there is a problem with the employee's request, to communicate that problem at the time. Where in the record is this email where a supervisor says that there's meaningful work that she can do that doesn't require meetings? Okay. So there's the – record page 127 is where the supervisor responded to her saying that she could do two hours' work a day and that he said that she could do meaningful work, which in his deposition he explained meant work at her level, capacity, and experience that was equally significant to what she had done before. That's Schlendorf in May? Yes. And then in October, on October 5th, on page 1622, you see a description of the job that was available for Ms. Reagan-Diaz in the Corporate Policy Office, and it says that at the top, as most of the performance management unit work is collaborative and meeting intensive, they're not going to assign her to that part of the RPO, the Resource Planning Office, but they identified reassignment to the Corporate Policy Office where she could work, do policy manager functions, work on Sentinel, and this was on two hours a day, which you'll see on page 1623 is where it's specifically in writing that she was going to be coming back two hours a day at that point when they identified the CPO assignment. This is what was communicated to her at the time. Nobody said, oh, we need you here for impromptu meetings. That was something that came up in litigation, and it comes from Ms. Reagan-Diaz's testimony when she was describing what she had done at a particular stage of the Sentinel project before she was injured. Yes, that stage required impromptu meetings, but in the time period that's relevant under MNTER, the FBI had projects at Ms. Reagan-Diaz's level that the supervisor said she could do on a two-hour day schedule. Nobody said there was a problem about impromptu meetings, and there's extensive evidence that the Sentinel project, and in fact, in 1622, the same email explains that the work that Ms. Reagan-Diaz had been doing before is no longer necessary because Sentinel deployment has been completed. So at that point, the projects she had done before, which she testified about in her deposition as requiring impromptu meetings, were no longer happening. And so a jury could infer that, in fact, impromptu meetings were no longer necessary, that the judge got confused and thought that what Ms. Reagan-Diaz had been doing before, her projects, were the nature of her position. But they weren't the nature of her actual position. Her position is a project-based position, as described by Schlendorf, where the projects were changing all the time. Can I just make sure I understand your theory of injury here? What is the theory of injury? Let's suppose we were to agree with you. Oh, how was Ms. Reagan-Diaz harmed by being kept out of the workplace for over a year? She was harmed professionally, economically, and emotionally. She's an outstanding employee. She loves her job. She wanted to work. She wanted to get back on the team. As Schlendorf said in 127, we're excited to get you back on the team. In other documents, he said, we can't wait to have you back in any capacity. She was a great employee that he knew was a great employee. He wanted her back on the team. She wanted to be back on the team. There was an emotional harm to being excluded during that time. She's also a professional. She's a highly accomplished person. She did not want to be sitting at home taking workers' compensation payments for that year. She wanted to be back in the workplace. And there's an economic loss as well. It also affected her step increase to this day. She's still affected by that because it was delayed by several months while she was out. Did she ever seek reassignment? She did not. She was not told about that October email, the available assignment and the CPO. And nobody told her that she was not able to do her essential functions. So under the regulations for the Rehab Act, the way it works in the federal government, is if you can't do your essential functions, then the accommodation of last resort is a reassignment. But nobody said to her, we think you can't do your essential functions. What they said was, we would love to have you back in any capacity. It was just the management in HR, workers' comp, and the reasonable accommodations office, they were getting confused, as they've now admitted, basically, that they got the law wrong, thought that workers' comp didn't allow a return, when actually the FECA did allow the very return. Ms. Reagan-Diaz was only being asked to be paid for the work that she was going to do two hours a day. And the FECA allows that. But that statute was miscited by the FBI, confused the judge, and the judge ended up using the very provision of the FECA that would allow what Ms. Reagan-Diaz was asking to do, was held, in this opinion, as a bar to her coming back to work, on page of the record. It just seems that most of the exchanges over the course of 2012, from early in the year until October, are about whether she can come back to her existing job at two hours per day. And she explicitly says, I can't commit to that because I can't meet all these deadlines. Well, okay, so I see what you're asking. She didn't explicitly say, I'm seeking a reassignment. But, again, the employer, if the employer thinks that you can't do your central functions, the employer is supposed to move to the next step, give you accommodation of last resort. But she has to prove that she's qualified with an accommodation to do the essential functions of a job. So it seems like they're pretty different theories. One is she could come back to her existing job and perform at two hours per day. And a very different one, it's a very different one to say, well, maybe I can't do that job, but you have to find me a different job. Well, this very issue was addressed in the ACCA opinion, ENBAC opinion of the D.C. Circuit. The D.C. Circuit explicitly ruled that when you are not qualified to do your current job, that the employer has a responsibility to consider a reassignment in another job. I understand, but I'm focused on preservation, right? She can only raise here the claims she pressed below. Well, what the D.C. Circuit said was the employee, and this is in a footnote 27 of ACCA, the employee is not required to be a detective to find the alternate, to find a vacancy if there is such a vacancy. So here Ms. Reagan-Diaz didn't, first of all, couldn't read the minds of the FBI in terms of what it was going to say in litigation four years later. She couldn't, she had no, nobody said to her you can't do the essential functions, so she wouldn't have known to ask for a reassignment. But in addition to that, she didn't know that the corporate policy office assignment, which actually is technically not a reassignment, that would have been just assigning her something different within her own resource planning office. So the corporate policy office assignments on 1622 are not technically a reassignment. But she didn't, she did not know about them, so she wouldn't have known to request it. And ACCA specifically ruled that the employer, if it identifies an assignment or a reassignment, that it's supposed to offer that to the employee, that the employee is not expected to be a detective to find out if there's a vacancy or another assignment that they could do. And so the importance of communication is emphasized in the interactive process. If the FBI had participated in the interactive process, we would not be here today. Schlendorf thought that there was meaningful work that could be done at her level, and if the projects had changed, what he testified to in his deposition was that they would have found equally important work that she could do because it was the nature of the department. There were projects changing all the time. So if there had been an interactive process, Mr. Schlendorf would have assigned Ms. Reagan-Diaz to the corporate policy office jobs or equally important work. If there had been an interactive process, the division would have offered Ms. Reagan-Diaz the corporate policy assignment, and she could have taken that. Let me make sure I understand your position with respect to one of the things that the district court ruled on. And that is, with respect to the disability discrimination claim, the district court ruled that because the plaintiff was receiving FECA workers' comp benefits, there needed to be an approved alternative work assignment by the Department of Labor. So it ruled that that was a procedure that had to be followed. Are you disputing that that is the procedure that had to be followed? Yes, I dispute that, and Miki has submitted a brief on that issue, that there is nothing in the FECA that would bar an employee from her rights under the Rehabilitation Act. The district court got the FECA wrong and ignored the 5 U.S.C. section 8116A1, which says that an employee can work while receiving FECA benefits. An employee can go back to her agency on a partial schedule and receive compensation from her agency. But that doesn't contradict saying that it has to be coordinated with the Department of Labor, who's paying the benefits. I agree. I understand why you're saying that. If you look at the district court's decision, this is how the district court explained its view on the AWA. It said on record page 1997, the district court miscited that provision, overlooked 1, so just cited to A, and thought that said right here in the decision, this is misleading federal agencies right now. It says federal employees may not receive compensation while receiving FECA benefits, saying that it's impossible for a federal employee to work part-time while on FECA, which is the opposite of what FECA actually says. What page are you on? Oh, 1997 of the record. What page in the decision is it? There should be a page number at the bottom there. Oh, page 25. Say again, please. 25. I mean, the language that you just cited about the benefits would have to stop, it's immediately followed by the FBI concluded that they had to coordinate with the Labor Department and get an alternate work assignment. So the court assumed that you couldn't go back to work if you're on FECA benefits, but that's contradicted by the next part of the provision in 1, A1. But you can actually go back to work and work and get paid in return for services actually performed for the agency. But what the court did was overlooked A1 and just looked at A, and then cites here that federal employees may not receive compensation while receiving FECA benefits, and then says, thus, FBI concluded that the only option available to the plaintiff was obtaining an AWA. So saying that, inferring from its misunderstanding of the statute, that the only option was the workers' comp process. But the Rehabilitation Act does not exclude employees who get disabilities from their work. So if you end up in a wheelchair because something fell on you at work, you still have rights to accommodations. The employer still has to build a ramp for you to get into the wheelchair. I understand that, but I don't think that the district court was saying that she had no rights under the Rehabilitation Act because she was getting workers' comp. The district court was merely saying that there's a process, and the process is that the accommodation is provided through an alternative work assignment. Well, so if the alternative work assignment process at that agency allowed for accommodations, then it would work together, as the statutes, I think, are designed to work together. But what happened here was the Reasonable Accommodations Office in August of 2012 deferred to the Workers' Comp Office, refused to process the request for reasonable accommodations. So the workers' comp manager said, I don't do reasonable accommodations. That's what he said to her when she said what I really want. Fair enough. But there is back and forth throughout this time, right? She initially says, I want to work at home. The FBI comes back and says, we'll take you back at four hours a day. She comes back and says, no, I'll come back at two hours a day. There's back and forth between your client and HUF. I mean, why isn't it just trying to work things out? Whatever label you put on it, they're engaged, they're trying to work something out, and ultimately the negotiation, as it were, comes to impasse when the FBI says we can't go all the way down to two hours per day. And that just tees up a legal question of whether she can go to trial on those facts. Right. And I see why you're asking that question. On its face it might look like, oh, there was a back and forth, there's an interactive process. The problem here is that it wasn't an interactive process, a flexible interactive process under the Rehabilitation Act. It was a workers' comp manager of the FBI, manager of the FBI, following what he thought. Now, he turned out to be wrong. What he thought is contrary to Lund, which is the DOL decision. He turned out to be wrong. But at the time he thought, is what his testimony is, that he was following the workers' comp procedure. What that meant was the flexible interactive process of the Rehabilitation Act, which would take into consideration the division head's views that she could return two hours a day and help advance the mission of the FBI. Those procedures, the flexible interactive process was ignored because the manager from another part of the FBI said, well, I know I'm here to do reasonable accommodations, but I won't do it because the workers' comp guy won't. But you also have BITCO, the direct supervisor, and Small, who's the head of her PMU organization, and Huff, who's at least in this general business, though admittedly on the labor side, all saying that with regard to this job and its requirements of being at meetings and such, two hours a day just won't work. Okay, so nobody said two hours a day wouldn't work to Ms. Reagan-Diaz. The only thing she was told was two hours a day will work. BITCO did not say two hours. I'm sorry. She was told it will work? It will work. That's what Schlendorf, the head of division, told her. That email on Record 127 was to Ms. Reagan-Diaz and said, this will work. She was ecstatic. She thought, oh, my gosh, I'm going back to work. I'm so excited. Two days later, workers' comp comes back and says, no, tell me when you're ready to do four hours. Four hours is nothing. We won't consider anything less than four hours. She said, I really want an accommodation. He said, go talk to the reasonable accommodations office. You want an accommodation? Go talk to them. Two months later, reasonable accommodations office says, I won't talk to you because workers' comp guy won't let you in. So this is a barrier. This is a barrier. They're not removing the barrier. I just want to emphasize that Huff doesn't know anything about resource planning office projects. None of what he said is based on the nature of the work, the nature of the position, as the district court described. So Huff's four hours a day was what he testified to, believing the DOL report didn't. Small, I'm glad you mentioned Supervisor Small because she's the one who wrote the October. She's the one who says in October that PMU is collaborative and meeting intensive, so two hours a day is just not going to work in PMU. Right. Which takes off the table everything but your claim for a reassignment. Well, right. So the PMU, actually, Ms. Reagan-Diaz was on paper she was assigned to PMU, but most of her work was not even in the PMU. So she was in resource planning offices much higher than that. So, yes, Ms. Small on October 5th says that PMU has too many meetings, but because of that they found other work in the same resource planning office that Ms. Reagan-Diaz could do. So this is not an accommodation of last resort at this point. It's in the same office. This is showing that she can do policy manager work. She'd be doing work, it says, generally handled by highly graded employees such as Sharon. So she would be doing the exact same work as her management program analyst position. It just would be in the corporate policy office, which was another office in the same division. If you have any concluding thoughts, we'll give you a little bit of time on rebuttal. But if you could make any concluding arguments. In ignoring the fact that a non-disabled employee was able to do sentinel work one to two hours a day and instead inferring that sentinel work always required a full-time schedule, the district court ignored critical evidence in the non-moving party's favor. In ignoring the corporate policy office assignment where Ms. Reagan-Diaz could work, the district court ignored evidence in the non-moving party's favor. The district court also ignored extensive testimony of Schlendorf saying that Ms. Reagan-Diaz could do the essential functions of her job and that it would help the department and ignored what the contemporaneous statements of the department were at the time, which a jury could infer that an employer would mention some of these issues at the time if these really were essential functions. And ignoring that inference that the jury could draw and instead relying on its own inference, the district court inferred from pre-disability projects that that's the nature of her position. In ignoring the contrary evidence to its own inference, the district court erred under well-settled law and told the Supreme Court recently, reminded the Fifth Circuit that summary judgment, there's been no trial in this case. Summary judgment was inappropriate on this basis. Thank you. Mr. Kolsky. Thank you, Your Honor. Good morning. May it please the Court. I'm Joshua Kolsky. Good morning. May it please the Court. Joshua Kolsky on behalf of the appellee. I'd like to start by addressing one of the arguments Ms. Carlton made, that another colleague was able to do, allegedly able to do Ms. Reagan-Diaz's work in one to two hours per day after she went on medical leave. And she's referring to work that was done by Elizabeth Stoddard. Now, it's true that Ms. Stoddard took over some of Ms. Reagan-Diaz's sentinel duties, but so did a number of other employees. So it's not that Ms. Stoddard was doing all of Ms. Reagan-Diaz's job responsibilities in one to two hours a day. We addressed this on page 28 of our brief. Gordon Bitko took over some sentinel responsibilities. Jonathan Russell did. Some contractors took over responsibilities. And, in fact, in plaintiff's opening brief, she acknowledges while Ms. Reagan-Diaz was on medical leave, her projects were divided among more than four employees at page 32 of her brief. So it's not correct that Ms. Stoddard was able to do Ms. Reagan-Diaz's job in one to two hours a day. There was also a lot of discussion about whether reassignment was necessary here and whether this corporate policy office assignment was a required reassignment for the plaintiff. The corporate policy office was a project. It was not a position. Reassignment may be a reasonable accommodation when there is a vacant position. There was no vacant position here. This was a project that they were looking at to try to see if there was something she could do on two hours per day. That's not-there was never any suggestion that she'd be fulfilling her essential job functions. That was not a position that was available. Now, when Ms. Reagan- even if that project is going to have some sort of finite duration, that they don't have to offer that to her as a reasonable accommodation if that can be done in the two-hour-per-day window that she can work? That's correct. Where the essential functions of her job require eight, nine, ten hours a day of work, it's not a reasonable accommodation to have her work two hours per day on a particular project. That's not what her job required. And I think there's a disconnect in some of the plaintiff's arguments between the idea of fulfilling essential job functions and performing meaningful work. So let me make sure I understand your argument and the implications of it. So let's suppose, just to make this easy, that there were five different things that she worked on before she was hurt. And they were able to find four people to take four of those things. So they divvied those up to four people. But there's nobody with any availability to do the fifth thing. And so she comes and she says, I can do item number five. And I can do that in the two-hour window. Then you're saying that there's no obligation to allow her to do that because she's still not demonstrating that she can perform the essential functions of her job. That's correct, Your Honor. To be qualified, an employee has to be able to perform all of the essential functions of their job, not merely some of the essential functions or one of the essential functions. So the law is supposed to make some sense. How does that resolution make any sense? I think that in these sorts of situations, an employer certainly has the option to waive essential functions. They can allow somebody to come back to work two hours per day. But that doesn't mean that the person is fulfilling the essential functions of their job. And so that could have been something that the FBI could have done here if they wanted to. But if her job required full-time work, collaboration with employees throughout the day, then not performing those functions means she's not doing her job. An employer doesn't have to fundamentally reconceive a position. So your argument is that if those five tasks were the essential functions of her job, then allowing her to come back and do one of the five, she's essentially asking for an accommodation that changes the essential functions of her job. It doesn't matter. It's immaterial for Rehabilitation Act purposes that they could find four other people to cover those other essential functions. The question as to whether she's a qualified individual is whether she could do all five. That's correct, Your Honor. So legally, you've got an argument, but it might not make common sense. In some situations, it may be to the benefit of the employer to have someone come back part-time, even if they're not fulfilling all of their essential job functions. But there are also reasons why that might not make sense. In fact, there is evidence in the record about the significant management challenges that would result from having to supervise someone on a two-hour-per-day schedule. Finding work that can be done on that very short amount of time, that presents a significant burden to management. And so it's a judgment call for an employer to decide, is it worth bringing in one person for two hours a day to get that amount of work from them, if it means having managers have to spend a significant amount of time looking around, finding, well, what work can we give this person? That's a judgment call for the employer. And in some cases, the employer may decide, why don't we bring this person in for a couple hours? But it's not required by the Rehabilitation Act. And in the ACCA case, which was cited by your opposing counsel, we've said we're not a super-employment board or personnel board. That's correct, Your Honor. You make a pretty powerful case on the facts, that this job really required someone to be there all or most of the time. But why shouldn't we look a little bit skeptically on that? Because the FBI did, in fact, offer to take her back at four hours a day, which seems a little bit hard to reconcile with this idea that she has to be on call at any given time for any huge classified meeting that might pop up on a moment's notice. Well, I mean, the FBI was looking for ways to accommodate the plaintiff throughout this process. And it did consider, and there is evidence that it was considering projects that she could perform on a two-hour-a-day basis. And as Your Honor points out, they did ultimately bring her back four hours a day. They were trying to keep this employee happy, and they were trying to accommodate her. But by doing that, they weren't conceding that she would be performing the essential functions of her job on a part-time schedule. We're not saying it's impossible for her to accomplish something in four hours or two hours. Certainly, she could do something during that time frame, but that doesn't mean that's not what performing one's essential job functions requires. And the evidence is that it's necessary to work eight, nine, ten hours a day in order to be as effective as the FBI has a right to expect of its employee in that position. So I think there's a difference between performing essential job functions and being there making a contribution. What's required by the Rehabilitation Act is the performance of essential job functions. Turning to the claims based on the denial of the 2012 Director's Award, those claims, in my view, are similar to a lot of non-selection or non-promotion claims that we see a lot of in this circuit. And typically, in those claims, the plaintiff will try to show a disparity in qualifications. They'll say, my qualifications were so far above the qualifications of the selectee that you can infer discrimination or retaliation. And there's nothing like that here. There's no comparison between Ms. Reagan-Diaz's contributions to Sentinel and the contributions of those selected for the Director's Award. At best, you can say that she's arguing that her contributions were roughly equivalent to some of the recipients. But that's not sufficient to show any pretext or an inference of discrimination or retaliation. In fact, she agrees that each of the recipients that she knows, which is 12 of the 15, they worked hard and they made a significant contribution to Sentinel. She, doesn't she argue, though, that one of the grounds, or that the explanation that's given, the legitimate, non-discriminatory reason that's given, was in part that she was mostly, her role was as a conduit in the Sentinel project. And doesn't she identify other people who were also described as conduits? There were who got the award, including, I guess it's McDougall and Martin. So, if that's the case, then one could arguably infer falsity from that. And then there'd be a question as to whether it would rise to the level, the circumstances would rise to the level to determine whether there's a jury question. So, her role as a liaison was, I believe that was one of the reasons, given for why her contributions were not as significant as some of the other people. But there were, the reality is there are a number of factors that go into these sorts of decisions. And yes, it's true that I think one or two other recipients also worked as liaisons, but everyone had different contributions. And so you have to look at the totality of factors. It's also true that Ms. Reagan-Diaz did not participate in the project during one of the most critical phases, which was the deployment phase. And she testified at her deposition that the deployment phase is an important part of the project. There's also deposition testimony from another witness that it's the most critical phase. So, taking into account the various contributions of all of these different people, the managers reasonably concluded that the 15 who were selected made the most significant contributions. At the time that there was like some sort of a preliminary list of people who would be nominated, I think that was in March time period, and she was on that list, right? She was on a list in, I believe it was created in a January, February 2012 time frame. It was created for a different award. It was a 2012 Attorney General's Award, and she was on that list. You're correct. Not the Director's? Not the Director's Award. Correct. So the Director's Award, the list, or the nominees for that award, was based on that earlier list for the Attorney General's Award. They took that list. It was months later. It was, I think, May to June time frame. And they looked at the project, including the fact that a lot of significant work had occurred in those intervening months, and they made adjustments. She was not the only person who was removed from the earlier list. Timothy Bell was also removed. He is non-disabled and does not have prior protective activity. So they made adjustments based on the additional time period of work, including this significant work towards the deployment, and made adjustments on that basis. For the Attorney General Award? For the 2012 Director's Award. So there's sort of three awards at issue. So she was on the Director's preliminary list. She was removed. I just want to be precise about this. The first list was for the 2012 Attorney General's Award, which there's no claim based on that award. They took that list when they developed the list for the 2012 Director's Award. They first took that list, and they made modifications. And made cuts. Correct. But you still have, as to the Director's Award, you have the testimony from the decision-makers that when they made their recommendation, they didn't know that she had engaged in protective activity. That's correct. With regard to that award. Correct. And, yeah, we made that argument in the District Court. The District Court didn't rule on that issue, but the evidence does reflect that they did not know about her prior protective activity at that point. All right. Thank you. Okay. And we would just ask the Court to affirm the decision below. Thank you. All right. So, Ms. Carlton, you have expired all your time. We'll give you two minutes for rebuttal. I think the critical question is that this is a jury question at this juncture. The Corporate Policy Office assignment that was specifically identified as something that Ms. Raiken-Diaz could do, a jury could look at that and see that Ms. Raiken-Diaz was able to do her actual functions. Schedule is not a function unless there's something functional about the schedule. And so, for example, an airline pilot would have to be in the air for the full eight hours. But here, Ms. Raiken-Diaz could do all of her functions during the time that she was working, as this document on Record 1622 reflects. And a jury could, because a jury could find that, this case needs to go to trial. It's true that courts have said that judges are not to act as a super-personnel department. Well, here, there is significance a jury could find to the fact that the highest level of division management wanted this employee back, thought that this employee could do her central functions as a jury could find his testimony to mean when he said that she could work at her level two hours a day. That's what management thought at the time, and it put in writing at the time. And so a jury could find that what management thought here reflects that Ms. Raiken-Diaz was able to do her essential functions. Let me interrupt you just a minute to say, now, what is the page reference for the highest level, again, to the argument? 127. And what is very important, and which is the part that the district court left out of the decision, is that Mr. Schlendorf testified and explained what he meant by meaningful work on a two-hour day schedule on page 1114 of the record and to 1115, 1115. Mr. Schlendorf explained what he meant by meaningful work, and that was work that was commensurate with her great experience and abilities and that would be equally impactful and important work. She could do that on a two-hour day schedule. A jury could find that she was capable of doing her essential functions as the management found. Instead, for grand exemplary judgment based on somebody who wasn't in supervising that very department, who just was confused, honestly or not, but was confused about the DOL's requirements, grand exemplary judgment of that actually is getting in the way of what management thought would be good for the agency. What they put in writing would advance the mission of the FBI. I think a jury would look at that and find that Ms. Reagan-Diaz could do her essential functions and that the FBI had an obligation to accommodate her and provide access to the federal workplace and be a model employer as the Rehab Act instructs it to be. Thank you. We'll take the case under advisory.
judges: Wilkins, Katsas, Sentelle